**COMMONWEALTH of Pennsylvania,**
**Appellee**

**v.**

**Edward NUNN, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 22, 2008.

Filed April 17, 2008.

Terrence J. McDonald, Moosic, for appellant.

Amil M. Minora, Assistant District Attorney, Scranton, for Commonwealth, appellee.

BEFORE: BOWES, SHOGAN and KELLY, JJ.

OPINION BY SHOGAN, J.:

¶ 1 Appellant, Edward Nunn, appeals from the judgment of sentence entered on June 12, 2007, in the Court of Common Pleas of Lackawanna County, after a jury found him guilty of robbery, theft by unlawful taking, simple assault, involuntary manslaughter, aggravated assault, possessing instruments of crime, and disorderly conduct. We affirm.

¶ 2 We glean the relevant facts underlying this case from the certified record.[1] In the early morning hours of May 24, 2005, Thomas Miller ("Mr. Miller") was working

---

1. The trial court chose not to file an opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

as a cashier at the Convenient Food Mart on the corner of Prescott Avenue and Ash Street in Scranton, Pennsylvania. At approximately 3:30 a.m., a black man entered the convenience store. After selecting some food items and placing them on the counter, the man grabbed Mr. Miller, put a gun to his head, and demanded money. Mr. Miller moved away from the register. As the man tried to open the register, Mr. Miller dialed 911. The man took about $100.00 from the register and the food, then fled. When the police arrived, Mr. Miller gave a description of the man. Later that morning, Mr. Miller viewed a photo array that included Appellant's picture. Mr. Miller positively identified Appellant as the robber.

¶ 3 Kushal Pall ("Mr. Pall") owned the Convenient Food Mart. He was at the store for several hours during the early morning hours of May 24, 2005; he left between 3:00 and 3:30 a.m. As he was driving out of the parking lot, Mr. Pall saw a black man and a woman coming out of a nearby apartment building. Mr. Pall knew the woman, Rose Johnson ("Mrs. Johnson"), because she had previously worked for him. As he was driving home, Mr. Pall received a call from Mr. Miller about the robbery. Mr. Pall immediately returned to the store. While speaking with Scranton Police Officer Salerno, Mr. Pall explained that he had seen Mrs. Johnson with a black man outside of the store. Mr. Pall recognized the man from seeing him in the store two or three times before this incident, but he did not know the man's name. Mr. Pall told the police that Mrs. Johnson lived in the nearby apartment building.

¶ 4 Appellant arrived unannounced at Mrs. Johnson's apartment between 3:30 and 4:00 a.m. on the morning of May 24, 2005. Before Appellant's arrival, Mrs. Johnson and Erin Dermody ("Ms. Dermo-

dy") were talking in the front bedroom where Ms. Dermody's young daughter Faith was sleeping. When Appellant arrived, Mrs. Johnson and Ms. Dermody moved with Faith to the TV room. Appellant sat on a love seat, while Mrs. Johnson sat on a chair. Ms. Dermody lay down on the couch with Faith. The TV was on and provided the only light in the room.

¶ 5 At some point, Mrs. Johnson and Appellant left the apartment. Mrs. Johnson went across the street to buy a newspaper, and Appellant went to the Convenient Food Mart. Mrs. Johnson returned to the apartment alone. Between five and ten minutes later, Appellant returned to the apartment with some food and juice. He then returned to the love seat in the TV room.

¶ 6 Officer Salerno had responded to the robbery at the Convenient Food Mart. He knew Mrs. Johnson as a neighbor. Based on the information he received from Mr. Pall about seeing Mrs. Johnson with a black man outside the store just before the robbery, Officer Salerno contacted his superior, Sergeant Duffy. Sergeant Duffy, Officer Charles, and Officer Schaufler went to Mrs. Johnson's apartment. They knocked and announced themselves as police officers. Mrs. Johnson admitted them. Officer Schaufler moved to the right down a hall, stopping at the entrance to the TV room. Sergeant Duffy and Officer Charles followed Mrs. Johnson into the TV room, where she proceeded to sit in the chair. As Sergeant Duffy watched Mrs. Johnson sit down, he saw Appellant sitting on the love seat.

¶ 7 Noticing that Appellant matched Mr. Pall's description of the man he saw with Mrs. Johnson just before the robbery, Sergeant Duffy ordered Appellant to show his hands. Appellant did not comply. Sergeant Duffy again ordered Appellant to show his hands. In response, Appellant

reached under his shirt, drew a gun, and pointed it at Sergeant Duffy. All three officers opened fire and retreated. Appellant was struck with gunfire multiple times. A police bullet fatally struck Ms. Dermody in her left thigh. None of the officers knew that Ms. Dermody and her daughter were in the room until after the shooting stopped, and they re-entered the TV room. During the course of their investigation, the state police determined that Appellant's weapon was a pellet gun, incapable of firing a bullet.

¶ 8 As noted above, a jury found Appellant guilty of, *inter alia,* robbery[2] and involuntary manslaughter. The trial court sentenced Appellant to incarceration for an aggregate term of twenty-nine years and three months to seventy-two years. This appeal followed.

¶ 9 On appeal, Appellant presents two issues:

1. Whether there was insufficient evidence presented to show causation for the charge of involuntary manslaughter?

2. Whether the trial court committed an abuse of discretion by allowing cross-examination of the Appellant that was beyond the scope of the direct examination which resulted in his prejudice?

Appellant's Brief at 3.

¶ 10 First, Appellant challenges the sufficiency of the evidence with regard to his conviction of involuntary manslaughter.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Bruce,* 207 Pa.Super. 4, 916 A.2d 657, 661 (2007), *appeal denied,* 593 Pa. 754, 932 A.2d 74 (2007) (*quoting Commonwealth v. Frisbie,* 889 A.2d 1271, 1274–1275 (Pa.Super.2005), *appeal denied,* 588 Pa. 747, 902 A.2d 1239 (2006)).

■ ¶ 11 Appellant claims that the evidence was insufficient to support the involuntary manslaughter conviction because the Commonwealth did not prove beyond a reasonable doubt a causal connection between his conduct and Ms. Dermody's death. According to Appellant, the direct cause of Ms. Dermody's death was the bullet fired from a police weapon, not his conduct.

---

**2.** Herein, the Commonwealth prosecuted Appellant for robbing the convenience store and for robbing his former neighbor, Clyde Hutchins, twice: once on May 13, 2005, and again several hours before the convenience store robbery on May 24, 2005.

¶ 12 The Crimes Code defines involuntary manslaughter and causation as follows:

(a) **General rule.**—A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person.

18 Pa.C.S.A. § 2504(a).

(a) **General rule.**—Conduct is the cause of a result when:

(1) it is an antecedent but for which the result in question would not have occurred; and

(2) the relationship between the conduct and result satisfies any additional causal requirements imposed by this title or by the law defining the offense.

18 Pa.C.S.A. § 303(a). To establish criminal causation, the Commonwealth must prove that the defendant's conduct was so directly and substantially linked to the actual result as to give rise to the imposition of criminal liability. *Commonwealth v. Long,* 425 Pa.Super. 170, 624 A.2d 200, 203–204 (1993), *appeal denied,* 535 Pa. 645, 633 A.2d 150 (1993) (*citing Commonwealth v. Rementer,* 410 Pa.Super. 9, 598 A.2d 1300, 1304 (1991), *appeal denied,* 533 Pa. 599, 617 A.2d 1273 (1992)).

¶ 13 In *Rementer,* we set forth a two-part test for determining criminal causation. First, the defendant's conduct must be an antecedent, but for which the result in question would not have occurred. *Rementer,* 598 A.2d at 1305; 18 Pa.C.S.A. § 303(a)(1). A victim's death cannot be entirely attributable to other factors; rather, there must exist a "causal connection between the conduct and the result of conduct; and causal connection requires something more than mere coincidence as to time and place." *Rementer,* 598 A.2d at 1305, n. 3 (*quoting* LaFave and Scott, *Sub-stantive Criminal Law,* Vol. 1, Ch. 3., at 391–392 (1986)). Second, the results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible. *Rementer,* 598 A.2d at 1305.

¶ 14 As to the first part of the test, the defendant's conduct need not be the only cause of the victim's death in order to establish a causal connection. *Rementer,* 598 A.2d at 1305. "Criminal responsibility may be properly assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result." *Long,* 624 A.2d at 203 (*citing Commonwealth v. Skufca,* 457 Pa. 124, 321 A.2d 889 (1974), *appeal dismissed,* 419 U.S. 1028, 95 S.Ct. 510, 42 L.Ed.2d 304 (1974)). The second part of the test is satisfied when the victim's death is the natural or foreseeable consequence of the defendant's actions. *Id.* (*citing Rementer* and *Commonwealth v. Paquette,* 451 Pa. 250, 301 A.2d 837 (1973)). "Where the fatal result was an unnatural or obscure consequence of the defendant's actions, justice would prevent us from allowing the result to have an impact upon a finding of the defendant's guilt." *Id.* at 204, 624 A.2d 200 (*citing Rementer,* 598 A.2d at 1306–1307).

¶ 15 A review of the evidence herein, in the light most favorable to the Commonwealth, reveals that Appellant's conduct satisfies both parts of the *Rementer* causation test. First, Appellant's conduct was a direct and substantial factor in Ms. Dermody's death. Appellant robbed the Convenient Food Mart at gun point. The officers went to Mrs. Johnson's apartment to question her about the robbery, knowing that she had been seen in the company of a possible suspect. The officers had no

previous knowledge that Appellant would be in the apartment. They encountered Appellant in a dark room, illuminated only by the TV. Appellant matched the description of the convenience store robbery suspect. When ordered to show his hands, Appellant did not comply. When ordered to show his hands a second time, Appellant chose to draw the same weapon used in the robbery and point it at Sergeant Duffy.

¶ 16 Based on the foregoing, we conclude that, but for Appellant being with Mrs. Johnson, robbing the convenience store at gun point, refusing twice to show his hands, drawing his weapon, and aiming it at Sergeant Duffy, the police would not have been in Mrs. Johnson's apartment and would not have opened fire in the TV room.

¶ 17 Second, Ms. Dermody's death was a natural or foreseeable consequence of Appellant's conduct. As stated previously, the police came to speak with Mrs. Johnson; they did not expect to find Appellant in Mrs. Johnson's apartment. Having focused on Mrs. Johnson and then on Appellant in the small, dark TV room, the police were not aware of Ms. Dermody or her daughter lying on the couch. Appellant, on the other hand, knew Ms. Dermody and her daughter were on the couch. When he first arrived at Mrs. Johnson's apartment, Mrs. Johnson, Ms. Dermody, and her daughter came into the TV room to sit with him. After returning from the convenience store, Appellant returned to the same love seat in the TV room where Ms. Dermody and her daughter were still lying on the couch. Despite knowing that Ms. Dermody and her daughter were present, Appellant chose to ignore the police commands, pull out his weapon, and point it at Sergeant Duffy, thereby drawing police fire.

¶ 18 Based on the foregoing, we conclude that Appellant could have foreseen that drawing police fire in a small, dark room could result in harm to Mrs. Johnson, Ms. Dermody, or her daughter, all innocent bystanders. We further conclude that the Commonwealth presented sufficient evidence that Appellant was criminally responsible for Ms. Dermody's death. Appellant's challenge to the contrary fails.

¶ 19 Appellant next challenges the extent of the prosecutor's cross-examination of Appellant. Specifically, Appellant complains that, despite defense counsel going "to great lengths [to] limit his testimony to only the events that occurred when the police came into the apartment," the prosecutor was permitted to cross-examine Appellant about his drug use, his relationship with Clyde Hutchins, and his involvement in the robberies of Clyde Hutchins and the convenience food store. Appellant's Brief at 5.

¶ 20 When reviewing a challenge to the scope of cross-examination, we employ the following standard:

> The scope and the manner of cross-examination are within the sound discretion of the trial court and will not be overturned unless the court has abused that discretion.

*Commonwealth v. Eichinger*, 591 Pa. 1, 37, 915 A.2d 1122, 1143 (2007), *certiori denied*, —— U.S. ——, 128 S.Ct. 211, 169 L.Ed.2d 158 (2007) (*citing Commonwealth. v. Auker*, 545 Pa. 521, 544, 681 A.2d 1305, 1317 (1996)).

¶ 21 Pa.R.E. 611 governs the mode and order of interrogation and presentation and provides, in relevant part, as follows:

**(b) Scope of cross-examination.** Cross-examination of a witness other than a party in a civil case should be limited to the subject matter of the direct examination and matters affecting credibility; however, the court may, in the exercise of discretion, permit inquiry

into additional matters as if on direct examination.

Pa.R.E. 611(b). This Court has broadly defined the scope of cross-examination to include "inferences, deductions, or conclusions which may be drawn therefrom, which explain or destroy the effect of the direct testimony." *Commonwealth v. Snoke*, 525 Pa. 295, 305, 580 A.2d 295, 300 (1990).

¶ 22 The record herein reveals that, against counsel's advice, Appellant chose to take the stand in his own defense. On direct examination, Appellant confirmed that he used to live at 512 Pittston Avenue. He described his education, employment, and family history. When directed to the night of May 24, 2005, Appellant explained that he was with Mrs. Johnson and Ms. Dermody at Mrs. Johnson's apartment that night "getting high" on crack. N.T., 3/14/07, at 134. They were waiting for Mrs. Johnson's friend to deliver more drugs when the police arrived. Appellant denied pulling a gun, then identified the various gunshot wounds he received.

¶ 23 The prosecutor's cross-examination of Appellant began with the following exchange:

Q. When you were residing at 512 Pittston Avenue, you met Clyde Hutchins; didn't you?

A. Yes, sir.

Q. You met him before May 13th; didn't you?

A. Yes, sir.

N.T., 3/14/07, at 135. Defense counsel objected, claiming the questioning was beyond the scope of direct examination. The trial court overruled the objection, and the prosecutor continued to explore Appellant's drug use, his relationship with Clyde Hutchins, and his involvement in the three robberies.

¶ 24 After careful review, we conclude that the trial court did not abuse its discretion regarding the scope of cross-examination. The prosecutor's initial questions were supported by the inference that Appellant knew and had access to Clyde Hutchins and his apartment before the first robbery on May 13, 2005, because they were neighbors in the building at 512 Pittston Avenue.

¶ 25 As to the remainder of the challenged cross-examination, the record reveals that the prosecutor continued to question Appellant without objection. An issue not raised in the trial court is considered waived for purposes of appellate review. Pa.R.A.P. 302(a). Because Appellant did not raise any objections to the remainder of the prosecutor's cross-examination, he waived any other challenges to its scope.

¶ 26 For the reasons stated above, we affirm the judgment of sentence.

¶ 27 Judgment of sentence affirmed.