J-A28039-25                    2026 PA Super 14

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ANDRES PATRICIO GARCIA ARCE | : | |
| | : | |
| Appellant | : | No. 405 MDA 2025 |

Appeal from the Judgment of Sentence Entered November 7, 2024
In the Court of Common Pleas of Columbia County Criminal Division at
No(s): CP-19-CR-0000438-2022

BEFORE: KUNSELMAN, J., McLAUGHLIN, J., and LANE, J.

OPINION BY LANE, J.:                    **FILED: JANUARY 28, 2026**

Andres Patricio Garcia Arce ("Garcia Arce"), appeals from the judgment of sentence imposed following his jury convictions for involuntary manslaughter and recklessly endangering another person ("REAP").[1] We hold: The Commonwealth's evidence was sufficient to sustain convictions for involuntary manslaughter and REAP where Garcia Arce's reckless operation of the vehicle on the highway, assaulting Spouse while driving, stopping the vehicle in the median, and forcibly removing Spouse from the vehicle in the proximity of high-speed traffic directly and foreseeably resulted in Spouse's death. Spouse's movement into the roadway, where he was fatally struck by a moving vehicle, did not constitute a superseding cause. After careful review, we affirm.

_____

[1] **See** 18 Pa.C.S.A. §§ 2504(a), 2705.

In July 2022, the Commonwealth charged Garcia Arce with, *inter alia*, involuntary manslaughter and REAP following the death of his spouse, Julio Cesar Perez, Jr. ("Spouse"). The Commonwealth presented the following evidence at trial. Garcia Arce and Spouse were married in 2019. In 2020, Spouse's seventy-five-year-old mother, Caroline Luzunaris ("Mother"), moved from Florida to live with the couple.

Mother described Spouse, who was thirty-five years old, as generally nonviolent and not suicidal. He received a diagnosis of bipolar disorder in 2011, for which he took prescribed medications. Spouse periodically experienced episodes requiring inpatient psychiatric treatment. About three weeks before the incident, Spouse experienced a manic episode while traveling from Florida and was involuntarily hospitalized in South Carolina for approximately one week.

Mother testified extensively about the events leading to Spouse's death. The night before the incident, she, Garcia-Arce, and Spouse drove Garcia Arce's parents — who were visiting — to an airport in New York for their return flight to Chile. Garcia Arce drove a Honda CRV (the "SUV"). During the drive back, an argument erupted in Queens, New York, over Mother mistakenly giving Spouse's medication to Garcia Arce's parents. Garcia-Arce was angry that Spouse no longer had his medication.

Mother recounted that as Garcia Arce was driving, he suddenly slammed on the brakes, removed the keys from the ignition, and ran across the street,

leaving her and Spouse stranded in the SUV in the middle of the road. Garcia Arce then returned and angrily ordered Spouse to get out of the SUV, but Spouse refused. Garcia Arce insisted on calling police and an ambulance because he believed Spouse needed to go back to the hospital. Police and emergency medical personnel arrived, evaluated Spouse, and determined he did not need to go to the hospital. Afterward, Garcia Arce took the SUV and left Spouse and Mother stranded in Queens, forcing them to spend the night at a friend's home.

The following day, Mother's daughter picked up Mother and Spouse from Queens and drove them to her home in Monroe County, Pennsylvania. That evening, Garcia Arce arrived at the daughter's home to pick up Spouse. Although Garcia Arce did not want Mother to accompany them, Spouse's sister insisted she go with them. The group planned to stop in Montour County for an errand on their way home to Harrisburg.

The group began the approximately one-and-a-half-hour drive westbound on Interstate 80. Interstate 80, in the area of the incident, consisted of two eastbound lanes in a seventy mile per hour zone, separated from the westbound lanes by a grassy, guardrail-free median, which provided unobstructed access between the directions of travel.

Garcia Arce drove, Spouse sat in the front passenger seat, and Mother sat behind the driver. Mother described Spouse as "tired[,]" and he reclined his seat. N.T., 9/11/24, at 124, 126. Mother testified that Garcia Arce "took

- 3 -

[a] wrong turn." *Id*. at 126. Despite her warning him that he was "going too fast[,] he kept speeding." *Id*. at 126-27. Garcia Arce "stepped on the gas[,] was screaming at [Spouse, who] wouldn't answer him [because h]e was trying to go to sleep. But that made [Garcia Arce] more mad and agitated." *Id*. Garcia Arce also poked Spouse's stomach with his finger, "screaming, 'Talk, talk, talk,'" but Spouse did not respond. *Id*. at 127, 129. Garcia Arce also said that "he wanted a divorce[,] and he was going to take everything from him." *Id*. at 164.

Mother testified that Garcia-Arce was "zig-zagging in the lane" and "going full speed." N.T., 9/11/24, at 129. Mother felt scared and thought they "were going to turn over." *Id*. Garcia-Arce then drove into the middle of the grassy median in the highway. Spouse "reached over" and turned off the car. *Id*. at 128. The car was stopped about ten feet from the highway. *Id*. at 130.

Mother testified that as the SUV stopped, Garcia Arce held Spouse "in a chokehold." *Id*. at 130. Mother stated:

> I said, "What are you doing?" [Garcia Arce] said, "[Spouse is] biting me." I said, "I would bite you, too, if you had me in a chokehold and I couldn't breathe." . . .
>
> * * * *
>
> [Garcia Arce] started hitting [Spouse] with . . . his cellphone, and [Spouse] was bleeding. [Garcia Arce] was holding onto the steering wheel with his foot . . . and pulling [and dragging Spouse] out of the car. It was easy for [Garcia Arce] because [Spouse's] seat was reclined to wiggle him through the driver's side.

* * * *

> [Garcia Arce] did it fast real hard and [Spouse] was bleeding. . . . I don't know if I put my hand behind the headrest and I probably thought I was going to do something, and [Garcia Arce] hit my hand. I had a big black and blue [mark] on my left hand.

*Id*. at 130-31.

Mother stated that after Garcia Arce dragged Spouse out of the SUV, with headlights from oncoming traffic illuminating the area, and she saw Spouse standing at the front of the SUV with blood running down his face. Mother tried to get out of the SUV, but "couldn't get out fast enough." N.T., 9/11/24, at 132. She testified that Garcia Arce was yelling while Spouse remained silent. As she moved toward them, she saw large trucks travelling eastbound on the interstate. Moments later, a truck, driven by Dennis Wenner ("Wenner") struck Spouse in the eastbound lanes, causing fatal injuries. Mother testified, "[H]is brains [were] next to my feet. I tried to go to my son to see what I could do for him but it was too late." *Id*. at 133. Then, a second vehicle driven by Mary Glidewell ("Glidewell") hit Spouse.

According to Mother's testimony, after Wenner's truck struck Spouse, Garcia Arce stood in front of her, called her derogatory names — including "bitch" and "witch" — and walked away "stone cold-hearted." *Id*. Mother ultimately had to move out of the roadway because more traffic was coming. When Mother looked up, Garcia Arce "was on the other side of the road." *Id*.

We note at this juncture that investigators initially received reports that three vehicles possibly struck Spouse — Wenner's truck trailer, Glidewell's'

vehicle, and a tractor trailer driven by Faruh Dadabaev ("Dadabaev"). However, based on physical evidence and witness interviews, investigators ultimately determined that only Wenner's truck trailer and Glidewell's vehicle struck Spouse.

Mother also clarified that, before Wenner's truck struck Spouse, it appeared to her that Garcia Arce pushed him:

> It was dark and [Garcia Arce and Spouse] disappeared, . . . when all of a sudden I saw [Spouse] kind of . . . looked like when somebody pushes you and you're trying to grab onto them or something to keep from falling, and that's when [Spouse] turned slightly and the truck came and hit him.

*Id*. at 167.

On cross-examination of Mother, Garcia Arce highlighted: (1) Spouse's mental health history; (2) Mother's financial interest in a wrongful death lawsuit; (3) her past theft convictions; (4) her demeanor on the stand; (5) her visual limitations due to poor vision and darkness, as Garcia Arce contended that the SUV's headlights were off; and (6) her memory lapses due to the passage of time since the events.

An eyewitness, Deanna Romeo ("Romeo"), testified that while driving westbound on Interstate 80, she noticed Garcia driving the SUV at a high rate of speed behind her, prompting her to move to the right lane. She then saw his SUV abruptly enter the grassy highway median that separated the east and westbound lanes of the highway. Romeo immediately called 911, believing there was a medical emergency. Moments later, Romeo also drove

to the median, parked near the SUV, and exited her car. The SUV, initially traveling westbound, was now parked in the median facing eastbound, essentially having completed a u-turn. Romeo observed both left-side doors of the SUV were open while the right-side doors remained closed. Romeo saw Spouse lying in the roadway, and Garcia Arce standing over him. When she approached, Garcia Arce walked to the shoulder of the road, and he was crying.

Wenner, whose trailer struck Spouse, testified to the following. On the night of the incident, he was driving eastbound on Interstate 80 in the left lane at approximately seventy miles per hour. He was hauling a twenty-four-foot enclosed trailer behind his pickup truck.[2] Wenner observed a "flash of . . . orange or red come out of the median, [seemingly] at a really high rate of speed. [He] moved . . . to the [right] lane as quickly as [he] could and [his] trailer [s]truck this object." N.T., 9/11/24, at 49. Wenner stopped his truck, realized his trailer had struck a person, and called 911.

The Commonwealth also presented dash-camera footage provided by Dadabaev, who was driving a tractor trailer. The dash camera footage showed the SUV's position in the median with its headlights illuminated, and the impact between Wenner's trailer and Spouse. Dadabaev provided a statement

---

[2] The trailer was carrying a racecar. *See* N.T., 9/11/24, at 50.

to the state troopers, which Pennsylvania State Police Corporal Jason Zoshak

("Corporal Zoshak") summarized at trial as follows:

> [Dadabaev] said that initially he was traveling [eastbound] in the right lane. There was [Wenner's] Ford or Chevy truck towing a trailer that was in the left lane[,] and he was following. [Wenner] passed him on the left lane. [Dadabaev] stated that as he got up, he could see [Wenner's] truck kind of move, and he believed [he had] hit a deer, until he was passing and he saw [Spouse lying on the road] in the travel lanes with his [right] arm up[.]

> * * * *

> [Dadabaev] believed that there was an individual running out from the median and waving his arms to stop traffic.

N.T., 9/12/24, at 68-69.

Pennsylvania State Police Trooper Ryan Golla ("Trooper Golla") testified

that he received a dispatch at 10:44 p.m. and arrived at the scene in less than

four minutes. Upon arrival, he observed: Wenner's truck and trailer stopped

on the eastbound shoulder and Spouse lying in the middle of the eastbound

lanes, wearing a red shirt. Trooper Golla saw Garcia Arce sitting on the right

side of the roadway in the location described by both Mother and Romeo.

Garcia Arce was wearing only trousers and had no shirt or shoes. The

trooper's motor vehicle recorder ("MVR") captured the scene as Trooper Golla

approached.

Pennsylvania State Police Trooper Michael Strenchock ("Trooper

Strenchock") testified as a forensic expert for the Commonwealth. Trooper

Strenchock responded to the scene where he found Spouse lying face-down

in the roadway with blood and debris nearby. The trooper observed the SUV

positioned in the median with its front passenger door open.[3]  He noted tire tracks showing the SUV had crossed from the westbound lanes into the median but had not entered the eastbound lanes.  Trooper Strenchock collected and documented extensive physical evidence, including blood on Garcia Arce's cellphone, the SUV, and items associated with Spouse.

The Commonwealth introduced photographs taken by Trooper Strenchock both during his processing of the scene and later of Garcia Arce at the state police barracks.  Trooper Strenchock testified that, prior to photographing Garcia Arce, he noticed that he was not wearing a shirt.  He observed bite marks on Garcia Arce's chest and abdomen and blood on his hands.

Trooper Strenchock also collected blood from Garcia Arce's SUV three days after the incident.  He noted that the blood on the front driver side interior of the door ("front rocker panel") and seat was dry, and this was consistent with collecting it several days after the incident and did not indicate it was unrelated to the events of that night.

County coroner Jeremy Reese ("Coroner") explained that his role is to determine the cause and manner of death for individuals in Columbia County.  Coroner testified that Spouse died from multiple blunt-force injuries consistent with the assault by Garcia Arce and vehicle impact.  Coroner explained that

---

[3] We note that the trial transcript did not establish when someone opened the front passenger door of the SUV.

"but for" the events leading to Spouse's removal from the SUV and the assaults he suffered, Spouse would likely have survived. N.T., 9/11/24, at 87, 95-96. Coroner expressly ruled out Spouse's past mental health diagnoses as a contributing factor to his death. Coroner further explained that Spouse's head and facial injuries could have impaired his orientation and judgment. Coroner described the injuries as severe, consistent with both the assault and the subsequent vehicle impact.

Serologist Brunee Coolbaugh and DNA analyst Danielle Martzall ("Martzall") testified regarding the collection and analysis of biological evidence. Martzall confirmed that the blood on Garcia Arce's cellphone contained a mixture of Garcia Arce's and Spouse's DNA, while the blood on the driver's seat and the front rocker panel matched Spouse, and did not match Garcia Arce as a contributor.

Pennsylvania State Police Corporal Matthew Hunter, a forensic mapping expert, testified regarding the position of Garcia Arce's SUV at the scene. He measured that the SUV stopped approximately six feet from the eastbound lanes of travel and about five feet from the pavement, illustrating how close Spouse was to active traffic when Garcia Arce removed him from the SUV.

Corporal Zoshak, lead investigator, testified regarding the investigation, which included interviews with Garcia Arce, Mother, and Dadabaev, MVR review, and collection of cellphones. He reviewed toxicology results showing the only drugs in Spouse's system were the prescribed medications to treat

his bipolar disorder. Corporal Zoshak also confirmed that Garcia Arce did not call 911.

Corporal Zoshak testified that following the incident, he and Sergeant Chris Tomlinson interviewed Garcia Arce. During the interview, Garcia Arce discussed moving back to Chile within a short time and planning to seek a divorce from Spouse because of ongoing marital problems. Garcia Arce maintained that Spouse's mental-health condition strained the marriage. He described episodes Spouse experienced in the past, including the incident in South Carolina where Spouse was non-violent but required medical treatment. Garcia Arce stated that he himself was prescribed medication for depression, held a medical marijuana card, and had used methamphetamine in the past — although he gave inconsistent accounts of when he last used it, ranging from several months to two months prior to the incident.

During the interview, Garcia Arce offered inconsistent accounts of the assault, denying that he placed Spouse in a headlock or chokehold, while admitting he may have struck Spouse with his cellphone. Corporal Zoshak further testified that although Garcia-Arce gave detailed answers about peripheral topics — such as the songs he sang — he was evasive and deflected questions when asked about the alleged assault. Corporal Zoshak viewed this behavior as indicative of deception. Garcia Arce also expressed awareness of financial benefits arising from Spouse's death — related to marital property of

homes in Danville and Harrisburg, a recreational vehicle, and Spouse's receipt of more than $13,000 monthly for a medical malpractice annuity.

Furthermore, Garcia-Arce provided Corporal Zoshak inconsistent accounts of how Spouse exited the SUV, suggesting Spouse left through the front passenger door and even using pens, during the interview to demonstrate various scenarios. He denied any physical fight outside the SUV, then could not specify which side Spouse exited the car, and claimed Spouse simply ran into traffic. Garcia Arce stated that after Wenner's trailer struck Spouse, he approached only within a few feet, believing Spouse's injuries were too severe to provide aid. After the second strike from Glidewell's vehicle, he did not approach and instead sat on the side of the road.

Corporal Zoshak observed two bite marks on Garcia-Arce's torso — one above the right nipple and another near the right rib cage. Corporal Zoshak also inspected the SUV, noting the condition of the seats and center console and the presence of blood on the driver's seat and the front rocker panel. Corporal Zoshak testified that he heard Mother's testimony both at the preliminary hearing and at trial, and that her accounts of the events were consistent with his above observations.

Garcia Arce testified on his own behalf about the events leading to and during the incident resulting in Spouse's death. He explained that in the weeks preceding the incident, Spouse had been experiencing increasing mental-health instability. In early May 2022, three weeks before the incident, Garcia

Arce and Spouse traveled to Florida to move Mother's belongings to her new residence in Danville, Pennsylvania. While there, Spouse went out one night without notifying Garcia Arce — behavior Garcia Arce stated was not unusual given their "open marriage." N.T., 9/12/24, at 89. When Spouse returned, however, he was acting erratically. Garcia Arce testified that while the pair were traveling back to Pennsylvania, Spouse was involuntarily committed in South Carolina after continuing to exhibit erratic but nonviolent behavior. Garcia Arce added that Spouse had periods of non-compliance with his prescribed medications, which Garcia Arce believed contributed to his deteriorating mental state.

On the day before the incident, Garcia Arce drove with Spouse and Mother to New York to take his parents to the airport. During the return trip, heavy traffic and unclear directions caused tension inside the vehicle, and Mother repeatedly yelled instructions prompting Garcia Arce to pull over. Spouse, who was largely asleep, awoke and moved into the driver's seat despite being unfit to drive. When Garcia Arce could not persuade Spouse to move, he called 911. Emergency personnel assessed Spouse, but he refused hospitalization. Since neither Spouse nor Mother could drive, Garcia Arce drove the vehicle back to Harrisburg alone to care for their dogs. He did not explain why he did not take Spouse and Mother with him.

Garcia Arce further testified to the following. The next morning, Spouse contacted Garcia Arce to purchase a train ticket from New York to

Pennsylvania. Garcia Arce informed Spouse that Spouse could not travel because he had lost his identification in Florida. Later that day, Spouse's sister asked Garcia Arce to pick up Spouse from her home in Monroe County. Garcia Arce agreed and planned to bring only Spouse back to Harrisburg, but upon arrival, Spouse's sister insisted that Mother accompany them.

Garcia Arce stated that Spouse had been without both his chronic and acute medications for two days because "[M]other misplaced [Spouse's] medication," and he was concerned that the lack of medication could cause severe symptoms. N.T., 9/12/24, at 101. He testified that he brought "the full afternoon medication for [Spouse]" to Monroe County and placed it in Spouse's hand before leaving but was unsure whether Spouse took the medication. *Id*. at 121.

Regarding the events on Interstate 80, Garcia Arce admitted that he drove while an argument unfolded, after he informed Spouse that he wanted a divorce. Garcia Arce testified that Spouse initially appeared agitated but later became quiet. Garcia-Arce claimed that at some point, while he was driving sixty-five to seventy miles per hour, Spouse reached for or wrestled over the steering wheel. Garcia Arce lost control, and the vehicle came to rest in the grassy median. As Garcia Arce attempted to retrieve his phone, Spouse bit him. He denied placing Spouse in a chokehold but admitted that he may have struck Spouse with his cellphone while exiting the SUV. Garcia Arce

further testified that Spouse bit him a second time as Garcia Arce unbuckled his seatbelt to exit the SUV.

Garcia Arce testified that after exiting the vehicle, he did not see how Spouse exited the SUV. According to Garcia Arce, the next time he saw Spouse, Spouse was already beginning to run across the eastbound lanes of Interstate 80. First, Wenner's trailer struck Spouse, although Wenner attempted to avoid him, and a second vehicle hit Spouse moments later. Garcia Arce claimed that he removed his shirt to cover Spouse, and this could explain the presence of blood on his hands and his cellphone. Garcia Arce further claimed that he called for assistance on his cellphone and remained at the scene until police arrived.

Garcia Arce introduced a group text message that Spouse sent approximately forty minutes before the incident, in which Spouse stated he "started the fight with" Garcia Arce and had not taken his medication for two days. N.T., 9/12/24, at 111.

On cross-examination, the Commonwealth questioned Garcia Arce about his demeanor at trial, noting that he remained composed and displayed little emotion throughout the trial. Garcia explained that although he may not show emotions, he still felt them. Garcia Arce also explained that he left his job in August 2021 to manage family responsibilities, and he relied on retirement savings and Spouse's medical malpractice annuity income. He stated that Spouse primarily drove the SUV, even though Garcia Arce drove it

on the day of the incident. Garcia Arce denied intentionally striking or choking Spouse while driving, explaining that any physical contact occurred only as he attempted to cover Spouse's body on the highway.

The Commonwealth also challenged Garcia Arce's claim that he could not remove Spouse from the SUV due to their relative sizes. Garcia Arce asserted at trial that at five-foot-eight inches tall and weighing approximately two hundred pounds, he was physically incapable of moving Spouse, whom Garcia Arce described as five-foot-eleven inches tall and weighing roughly two hundred eighty pounds. The autopsy, however, listed Spouse's weight as two hundred ten pounds.

On the witness stand, Garcia Arce acknowledged that he had difficulty recalling certain events and that he provided "more guarded" responses during his interview with Corporal Zoshak because "there were leading questions." N.T., 9/12/24, at 130. The Commonwealth further confronted him with evidence suggesting that his account conflicted with the physical and forensic evidence.

On September 12, 2024, the jury found Garcia Arce guilty of involuntary manslaughter and REAP.[4] On November 7, 2024, the trial court sentenced Garcia Arce to ten months to two years' incarceration.

---

[4] During trial, at the close of the Commonwealth's case, the trial court granted Garcia Arce's demurrer to an additional charge of aggravated assault. *See* N.T., 9/12/24, at 79.

Garcia Arce filed a timely post-sentence motion arguing, *inter alia*, that the verdict was against the weight and sufficiency of the evidence. The trial court denied Garcia Arce's post-sentence motion. Garcia Arce filed a timely notice of appeal. Both Garcia Arce and the trial court complied with Pa.R.A.P. 1925.

Garcia Arce presents the following issues for our review:

1. Because [Spouse's] act of running into oncoming traffic after his conflict with Garcia Arce had concluded and was not foreseeable, can the Commonwealth produce sufficient evidence to prove beyond a reasonable doubt that Garcia Arce acted recklessly and that his conduct directly caused [Spouse's] death?

2. When the trial court evaluated the evidence in the light most favorable to the Commonwealth and supported its denial of Garcia Arce's weight-of-the-evidence challenge with findings not supported by the record, did the trial court commit an abuse of discretion?

Garcia Arce's Brief at 9 (issues reordered for ease of disposition and unnecessary capitalization omitted).

Garcia Arce's first issue challenges the sufficiency of the evidence supporting his convictions for involuntary manslaughter and REAP. Our review of a sufficiency claim is well-settled:

Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the

province of the factfinder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the factfinder.

*Commonwealth v. Scott*, 325 A.3d 844, 849 (Pa. Super. 2024) (citation and brackets omitted, and italicization added).

"A person commits [REAP] if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S.A. § 2705. "A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person." 18 Pa.C.S.A. § 2504(a). "Stated differently, 'involuntary manslaughter requires 1) a mental state of either recklessness or gross negligence, and 2) a causal nexus between the conduct of the accused and the death of the victim.'" *Commonwealth v. Fabian*, 60 A.3d 146, 151 (Pa. Super. 2013) (brackets omitted).

The Crimes Code[5] defines the term "recklessly" as follows:

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustified risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross

_____

[5] *See* 18 Pa.C.S.A. §§ 101-9546.

deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b)(3)).

The Crimes Code defines "causation" as follows:

(a) **General rule.** — Conduct is the cause of a result when:

(1) it is an antecedent but for which the result in question would not have occurred; and

(2) the relationship between the conduct and result satisfies any additional causal requirements imposed by this title or by the law defining the offense.

18 Pa.C.S.A. § 303(a)(1)-(2). "To establish criminal causation, the Commonwealth must prove that the defendant's conduct was so directly and substantially linked to the actual result as to give rise to the imposition of criminal liability." **Commonwealth v. Nunn**, 947 A.2d 756, 760 (Pa. Super. 2008) (*citing* **Commonwealth v. Rementer**, 598 A.2d 1300, 1304 (Pa. Super. 1991)).

"A victim's death cannot be entirely attributable to other factors; rather, there must exist a 'causal connection between the conduct and the result of conduct; and causal connection requires something more than mere coincidence as to time and place.'" **Nunn**, 947 A.2d at 760 (citation omitted); **see also** 18 Pa.C.S.A. § 303(a). "Where the fatal result was an unnatural or obscure consequence of the defendant's actions, justice would prevent us from allowing the result to have an impact upon a finding of the defendant's guilt." **Nunn**, 947 A.2d at 760. "[S]o long as the defendant's conduct started the

chain of causation which led to the victim's death, criminal responsibility for the crime of homicide may properly be found." *Fabian*, 60 A.3d at 152 (citation omitted).

Garcia Arce argues that the Commonwealth failed to prove the elements of involuntary manslaughter and REAP. He contends that his conduct was not reckless, as he did not consciously disregard a substantial and unjustifiable risk of death or serious bodily harm. First, with respect to his driving, Garcia Arce maintains, "Even assuming . . . that [he] had been speeding, such action[] would not have rendered him reckless absent some other circumstances that indicated speeding was 'a gross deviation' from the standard of care of an ordinary person." Garcia Arce's Brief at 64. He contends that the only testimony tending to show recklessness — Mother's — "suffered from a number of defects and was so unbelievable as to elicit comment from the Trial Court."[6] *Id*. at 63.

Second, Garcia Arce claims that Spouse's actions were unforeseeable. He asserts that "assuming the Court adopts [Mother's] version of events" — that Garcia Arce pulled Spouse from the SUV through the driver's door —

---

[6] Garcia Arce's averments that Mother's testimony was "unbelievable" and "incredible," Garcia Arce's Brief at 63, 65, go to the weight, not the sufficiency, of the evidence. *See Commonwealth v. Juray*, 275 A.3d 1037, 1043 (Pa. Super. 2022) (explaining "that a sufficiency of the evidence review does not include an assessment of credibility of testimony[, and i]nstead, such arguments are more properly characterized as challenges to weight of evidence"). We therefore address these claims in Garcia Arce's second issue.

- 20 -

Spouse voluntarily ran into oncoming traffic, contrary to his own safety, and he was not fleeing an ongoing assault. *Id*. at 67. Garcia Arce submits that his conduct was not the direct or substantial cause of Spouse's death, and that Spouse's reaction constituted a supervening cause, breaking the chain of causation. Garcia Arce insists:

> After Garcia Arce . . . pulled Spouse from the [SUV], Garcia Arce remained either seated in the [SUV's] driver's seat or standing next to said seat. Meanwhile, Spouse was stationed near the front of the . . . car, *as Garcia Arce continued to yell*. For several minutes, the parties maintained their respective distances until Spouse unexpectedly raced into oncoming traffic. There is no evidence — even from [Mother] — that Garcia Arce moved aggressively toward Spouse in any way, let alone that Garcia Arce had pursued Spouse into the eastbound lane and was "right behind [him]" at the moment he was hit by the oncoming vehicle.

Garcia Arce's Brief at 78 (citations and unnecessary capitalization omitted and emphasis added). Garcia Arce concludes that unlike the victim in *Rementer*, 598 A.2d 1300, Spouse did not act to escape near-certain danger, and therefore, the Commonwealth could not establish recklessness or causation as required for his convictions.

In its opinion, the trial court concluded that the Commonwealth provided sufficient evidence to support Garcia Arce's convictions for involuntary manslaughter and REAP:

> Mother testified, credibly in the eyes (and ears) of the jury . . . that she was in the back seat of the [SUV] driven by Garcia Arce. . . . Spouse was in the front passenger seat. A verbal argument turned into a physical fight while they were travelling on the Interstate. Garcia Arce pulled Spouse out of the driver's side (front door) and Spouse, to get away from Garcia Arce, ran onto the highway and was struck and killed. If Garcia Arce had not

- 21 -

pulled over, and pulled Spouse from the driver's side, in the midst of a physical alteration, Spouse would not have tried to escape by running across the highway. These are actions taken by Garcia Arce that "caused" Spouse's demise. This is what the jury heard.
. . .

* * * *

. . . In the most reduced, simplest of terms . . ., the jury heard that Garcia Arce and Spouse were both seated in the front seat of [the SUV], with Garcia Arce driving. An argument ensued and became violent[ ] *while driving on the Interstate*. Spouse bit Garcia Arce on his chest area while Garcia Arce had him in a headlock, *while driving on the Interstate*. Garcia Arce was speeding and ended up stopping on a "median" with Spouse trying to reach over to shut off the car. Garcia Arce placed him in a chokehold and dragged him out of the car. It was dark and Mother testified that they both disappeared into the darkness and that *she saw her son look like he was pushed right before he went into the roadway* and was struck.

Trial Court Opinion, 5/22/25, at 3-4 (unnecessary capitalization omitted and some emphasis added).[7]

Viewing the evidence in the light most favorable to the Commonwealth and giving it all reasonable inferences as verdict winner, we conclude that the record supports Garcia Arce's involuntary manslaughter and REAP jury convictions. *See Scott*, 325 A.3d at 849. The Commonwealth's evidence showed that Garcia Arce's actions set in motion the events that caused Spouse

_____

[7] For ease of review, when quoting the trial court's opinion, we have changed the references to "Defendant" to "Garcia Arce," references to "Victim" or "victim" to "Spouse" and references to "Victim's Mother" to "Mother."

to flee into the roadway, where the fatal collision occurred. *See Fabian*, 60 A.3d at 152; *see also Nunn*, 947 A.2d at 760; *Rementer*, 598 A.2d at 1308.

Garcia Arce's reliance on *Rementer* on the issue of causation is misplaced. In *Rementer*, the defendant violently assaulted the victim, who then fled, resulting in a passing vehicle fatally striking her. *See Rementer*, 598 A.2d at 1301. The trial court convicted Rementer of third-degree murder[8] following a non-jury trial. *See id*. at 1302. On appeal, he argued the Commonwealth failed to prove causation and malice because the victim's reaction, fleeing from his assault, constituted a supervening cause, which broke "the chain of causation between his assault . . . and her resulting death." *Id*. at 1304. This Court affirmed, holding that Rementer's repeated assault was a substantial and direct cause of the victim's death. *See id*. at 1308. The fatal outcome was a foreseeable result of Rementer's persistent and violent assault, and the victim's attempts to escape were natural and predictable responses. *See id*. Although the precise mechanism of death — the vehicle — was not foreseeable, the risk of serious injury or death was inherent in the situation Rementer created. *See id*. This Court concluded that the evidence sufficiently established legal causation and upheld the conviction of third-degree murder. *See id*.

---

[8] The Crimes Code defines third-degree murder as "[a]ll other kinds of murder," aside from first-degree and second-degree murder." 18 Pa.C.S.A. § 2502(c).

Likewise, in the instant case, Garcia Arce cannot now complain on appeal that Spouse chose a hazardous route to escape from his persistent assault, thus breaking the chain of causation. The jury was free to believe Mother's testimony that: (1) as Garia Arce was driving, he was speeding, "zig-zagging," poking and yelling at Spouse, and growing angry that Spouse was not answering; and (2) after Garcia Arce stopped the car in the highway median, he dragged Spouse out the driver's door and continued to scream at him. **See Scott**, 325 A.3d at 849; **see also** N.T., 9/11/24, at 129-33. Against these circumstances, Spouse's flight was a foreseeable consequence of Garcia Arce's reckless conduct, establishing the causation element for both the REAP and involuntary manslaughter charges. **See Nunn**, 947 A.2d at 760; **see also Rementer**, 598 A.2d at 1308. Coroner expressly ruled out Spouse's past mental health diagnoses as a contributing factor to his death, and the jury was likewise free to weigh this testimony. Moreover, the Commonwealth presented sufficient circumstantial evidence, including eyewitness testimony and video, for a reasonable jury to conclude beyond a reasonable doubt that Garcia Arce's conduct directly led to Spouse's death. **See Scott**, 325 A.3d at 849. We therefore find that Garcia Arce's first issue merits no relief.

In his second issue, Garcia Arce challenges the weight of the evidence supporting his convictions. Our review of a weight claim is well-established:

> When reviewing a challenge to the weight of the evidence, we review the trial court's exercise of discretion. A trial court may sustain a weight challenge only if the verdict is so contrary to the evidence as to shock one's sense of justice. The weight of the

evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses. We defer to the trial court's decision regarding a weight of the evidence claim because it had the opportunity to hear and see the evidence presented.

***Commonwealth v. Clemens***, 242 A.3d 659, 667 (Pa. Super. 2020) (citations and quotation marks omitted).

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Commonwealth v. Beatty***, 227 A.3d 1277, 1290 (Pa. Super. 2020) (citation omitted).

Garcia Arce argues that the trial court abused its discretion in denying his weight-of-the-evidence challenge because it failed to independently assess the credibility of the Commonwealth's key witness, Mother, and instead relied solely on the jury's determination. He contends that Mother's testimony was inherently incredible due to her poor eyesight, the near-total darkness at the scene, and assertions of physically impossible conduct, including Garcia Arce's pulling a larger, resisting Spouse across the center console and driver's seat of the SUV with only "one hand." Garcia Arce's Brief at 40. Garcia Arce maintains that her account was inconsistent, particularly regarding how

Spouse entered the roadway, a central element of the Commonwealth's theory of liability. Garcia Arce further asserts that Mother had a strong motive to fabricate her testimony, including financial interests in Spouse's estate and wrongful-death litigation, and she had prior convictions for crimes of dishonesty, and what he characterizes as a tendency to conceal herself during testimony.

Additionally, Garcia Arce challenges the trial court's conclusion that other witnesses and forensic evidence corroborated Mother's testimony. He contends that, to the contrary, the testimony of Wenner and Romeo supported his account of events. According to Garcia Arce, Wenner's testimony that Spouse "*r[a]n into the roadway*" corroborated his position that Spouse was not "disoriented from an assault by Garcia Arce" and did not fall into the road as Mother claimed. Garcia Arce's Brief at 44 (emphasis in original). He further argues that Romeo's testimony — that the SUV was traveling at a high speed but was not driving erratically before veering into the median — supports his assertion that he was not operating the vehicle recklessly. **See id**. at 63.

Garcia Arce claims that the DNA evidence, referenced by the trial court, was inconclusive and indicated nothing more than Spouse's previous, ordinary contact with the SUV and phone, rather than the assault the Commonwealth alleged. Garcia Arce contends that the trial court's reliance on the jury's assessment, coupled with the jury's refusal to recognize the numerous indicia of falsity and impossibility in Mother's testimony, rendered the court's denial

of a new trial unreasonable. For these reasons, Garcia Arce asserts that the verdict is against the weight of the evidence, shocks the conscience, and warrants remand for a proper independent evaluation of witness credibility and evidence.

In addressing Garcia Arce's weight of the evidence claim, the trial court explained:

> The testimony in this trial is not so tenuous, vague and uncertain that it shocks the consci[ence] of the trial court.
>
> a. It was not at all evident that any "acuity problems" of Mother rendered her incapable of seeing what occurred on the evening in question. The situation developed and occurred rapidly on a high speed interstate. The testimony did not evidence a lack of grasping what was happening/what happened in the relatively short period of time.
>
> b. It is not unusual for a witness to have animus against the defendant. The jury is permitted to factor that into their deliberations and accord it whatever "weight" they deem proper when assessing credibility.
>
> c. If, as Garcia Arce contends, there was a motive, the jury, again, was permitted to factor that into determining credibility.
>
> d. There is nothing impractical or impossible to believe as to what Mother observed. In a rapidly unfolding event, she testified as to what she observed and remembered. All of which was subject to cross examination and then evaluation by the jury. None of which was shocking to the consci[ence]. Significantly, although Garcia Arce downplays the DNA evidence, it is strongly supportive of Mother's version of the event.
>
> e. Garcia Arce also has a motive to skew the testimony. The jury may permissibly examine and factor into [its] decision making Garcia Arce's "stake" or interest in the

outcome. The jury heard from two witnesses (excluding Garcia Arce's testimony) as to how the accident unfolded. They evaluated and chose who to believe.

Order, 3/14/25, at unnumbered 2 (unnecessary capitalization omitted).

The trial court concluded:

Garcia Arce has pointed out the reasons the jury could have rejected the Commonwealth's case, admittedly built, in great part, upon the testimony of Mother. It did not. The jury was given the standard jury instructions as to weight and credibility. [The jury] could have rejected any of the testimony that [it] heard from the Commonwealth's witnesses, including Mother. [It] did not. Now Garcia Arce asks the higher court to come to a different conclusion.

Trial Court Opinion, 5/22/25, at 4 (unnecessary capitalization omitted).

Based on our review, we discern no abuse of discretion by the trial court in denying Garcia Arce's post-sentence motion challenging the weight of the evidence. Garcia Arce asks us to reweigh the credibility between two witnesses — himself and Mother — who offered conflicting accounts of the incident. *See Clemens*, 242 A.3d at 667. The jury's crediting Mother and discrediting Garcia Arce does not render the verdict shocking. *See id*. We add that the jury watched the dash-cam video showing Wenner's trailer making impact with Spouse and was free to weigh that evidence as well. Moreover, because the trial court had the opportunity to hear and observe the testimony firsthand, we afford substantial deference to its findings and reasoning regarding witness credibility. *See id*. We therefore decline to disturb the trial court's determination that the verdict did not shock its sense

- 28 -

of justice. The evidence presented supported Garcia Arce's guilt, and his second issue provides no basis for relief.

Having found no merit to any of Garcia Arce's appellate issues, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/28/2026