J-A16006-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
                                             :            PENNSYLVANIA
                                             :

           v.                               :
                                             :
                                           :

SHANNON ROBERT WATTS          :
                                           :

           Appellant                  :       No. 1468 MDA 2020

Appeal from the Judgment of Sentence Entered September 25, 2019,
in the Court of Common Pleas of Franklin County,
Criminal Division at No(s): CP-28-CR-0001071-2017.

BEFORE:    KUNSELMAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KUNSELMAN, J.:      **FILED: NOVEMBER 5, 2021**

Shannon Robert Watts appeals from the judgment of sentence imposed after a jury convicted him of drug delivery resulting in death (DDRID).[1] Upon careful review, we affirm.

On October 24, 2016, Allen Chapman invited his friend, Forrest Miller, and Miller's family over to his apartment, where he lived with his wife and daughter. While there, Chapman drank alcohol and Miller smoked marijuana.

Later, Chapman and Miller went to Watts' house to buy prescription narcotics. After each bought 4 pills from Watts, Miller crushed 2 and snorted them. Chapman did the same with all 4 pills he purchased from Watts. After

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2506(a).

leaving Watts' house, Chapman and Miller briefly stopped at a bar and then a store to buy beer and cigarettes.

Chapman and Miller later returned to the apartment. Chapman was irritated, acted a bit crazy, and argued with his wife. He appeared high and spacey, had trouble talking, stumbled around, and needed help with eating. Shortly after Miller and his family left, Chapman fell asleep on the sofa.

The next morning, Chapman's wife found him still asleep on the sofa, snoring. She shook his shoulder to try to wake him, and his head fell off the arm of the sofa. Chapman then went silent and stopped breathing.

When the paramedics arrived, Chapman was not breathing and had no pulse. The paramedics used a defibrillator and started CPR on Chapman. On the way to the hospital, the paramedics continued to try to resuscitate Chapman, but could not keep his heart beating. The paramedics pronounced Chapman dead.

The next day, the police interviewed Miller about what occurred the night before. Miller and his girlfriend had consumed the other 2 pills he got from Watts. The police set up a controlled buy using Miller as a confidential informant to buy drugs from Watts.

Miller met Watts and bought 3 oxymorphone pills from him. As a result, the police arrested Watts and interviewed him about Chapman. Watts admitted that he sold pills to Miller, and watched Miller and Chapman snort them. Watts was charged with Chapman's death.

Following trial, a jury convicted Watts of DDRID and other related offenses. The trial court sentenced Watts to 78 months to 240 months of incarceration. Watts filed a post-sentence motion, which the trial court denied. No appeal was filed.

After an amended PCRA petition, the court reinstated Watts' direct appellate rights. Watts filed this timely appeal. Watts and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

On appeal, Watts raises the following two issues:

1. Whether the Commonwealth's evidence was sufficient to prove that [Watts'] delivery of drugs was a direct and substantial cause of the death of Allen Chapman?

2. Whether, in the alternative, the weight of the evidence was so weak and inconclusive such that no possibility of guilt should have been determined that [Watts'] delivery of drugs was a direct and substantial cause of the death of Allen Chapman?

Watts' Brief at 9.

In his first issue, Watts claims that there was insufficient evidence to convict him of DDRID. In reviewing a sufficiency of the evidence claim, this Court:

must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

*Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa. Super. 2011) (citations omitted). However, "the inferences must flow from facts and circumstances

- 3 -

proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt." ***Commonwealth v. Scott,*** 597 A.2d 1220, 1221 (Pa. Super. 1991). "The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review." ***Id.*** "Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Diamond,*** 83 A.3d 119, 126 (Pa. 2013).

> DDRID is defined as follows:
>
> A person commits a felony of the first degree if the person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of . . . The Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance.

18 Pa.C.S.A. § 2506(a). The offense "consists of two principal elements: (i) intentionally administering, dispensing, delivery, giving, prescribing, selling or distributing any controlled substance or counterfeit controlled substance and (ii) death caused by ("resulting from") the use of that drug." ***Commonwealth v. Kakhankham,*** 132 A.3d 986, 991-92 (Pa. Super. 2015) (footnote omitted).

Watts does not challenge whether he sold a controlled substance to Chapman. Instead, Watts argues that the evidence failed to satisfy the second element, *i.e.*, that the drugs he sold to Chapman caused his death. Watts' Brief at 13. According to Watts, the Commonwealth's experts could not

distinguish between Chapman's physical ailments and his substance abuse as the cause of death. Additionally, the evidence showed that Chapman had other substances in his blood. *Id.* at 14. Thus, Watts contends that the evidence was not sufficient to establish that the drugs Chapman got from him were a direct and substantial cause of Chapman's death. *Id.* at 13. We disagree.

The causal relationship necessary to impose criminal liability under the DDRID statute is a "but-for" test of causation. *Commonwealth v. Carr*, 227 A.3d 11, 15-16 (Pa. Super. 2020). "[C]riminal causation requires [that] the results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible." *Id.* However, a defendant's conduct "'need not be the only cause of the victim's death in order to establish a causal connection. Criminal responsibility may be properly assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result.'" *Kakhankam*, 132 A.3d at 993 n.8 (quoting *Commonwealth v. Nunn*, 947 A.2d 756, 760 (Pa. Super. 2008)).

In this case, Dr. Nadine Koenig, a forensic toxicologist, testified at trial. *See* N.T., 7/16/19, at 64-90. Dr. Koenig tested Chapman's blood for the presence of alcohol and controlled substances. No alcohol was detected in his system in a measurable amount (above 10 milligrams per deciliter). THC (marijuana) was detected at 3.2 nanograms per milliliter. Both metabolites

(byproducts of a drug when the body breaks it down) of THC were detected at 1.2 nanograms per milliliter and 7.6 nanograms per milliliter. Norfluoxetine (an anti-depressant) was detected at 167 nanograms per milliliter. Oxycodone was detected at 27 nanograms per milliliter. Oxymorphone was detected at 638 nanograms per milliliter.

Dr. Koenig explained that oxymorphone is 6 to 10 times more potent than morphine; fatalities have occurred from 20 nanograms per milliliter to 550 nanograms per milliliter and higher. While oxymorphone may be prescribed by itself, it is also a component of oxycodone, which is found in Percocet.[2]

Dr. Michael Johnson, an expert in the field of forensic pathology, also testified at trial. *See id.* at 3-62. In determining the cause of Chapman's death, he relied on the findings from his autopsy of Chapman and the findings of Dr. Koenig.

Dr. Johnson testified that his autopsy revealed that Chapman a number of physical ailments. In particular, he had an enlarged heart, pneumonia, and arteriosclerotic cardiovascular disease (fatty deposits in the arteries). He later learned that Chapman had asthma. Additionally, he found crystalline, non-natural, material in Chapman's lungs consistent with a person crushing up a

---

[2] Notably, the record indicates the pills Miller and Chapman bought together from Watts were believed to be Percocets. The pills that Miller later purchased from Watts were determined conclusively to be oxymorphone. Which of these two drugs Chapman consumed is not significant in this case. Oxymorphone and oxycodone were both found in Chapman's system. Watts does not contend that Chapman obtained opioid drugs from another source.

pill and snorting it. The toxicology results showed a "very high" amount of oxymorphone in Chapman's system.

Dr. Johnson explained that by crushing and snorting the drugs, Chapman circumvented having his liver break down the drugs. This way, he would get high faster and better. Because drugs are typically swallowed, Dr. Johnson opined that this was an abuse, as was Chapman's mixing of various drugs.

Dr. Johnson further explained that the side effects of opioids, which oxycodone and oxymorphone are, have a direct effect on the brain, and on the way the heart and lungs work. Essentially, they suppress or depress one's respiratory drive, the mechanism that keeps a person breathing. In certain situations, the cardio-respiratory system can start to collapse preventing a person from getting typical respiration. Then the other organs are affected. Here, Chapman's heart condition, pneumonia, and asthma already put him at risk for sudden death and having respiratory problems. When he snorted the pills he got from Watts, it compounded his existing problems.

Dr. Johnson opined that the cause of Chapman's death was mixed substance abuse, pneumonia, an enlarged heart, and arteriosclerotic cardiovascular disease. Dr. Johnson further stated that all of these factors contributed to Chapman' death so that none of them could be "taken out" such that he would have lived. Dr. Johnson's testimony and opinions were given with a reasonable degree of medical certainty.

Based upon the evidence, we conclude that Watts' conduct was not "so extraordinarily remote or attenuated that it would be unfair" to hold Watts criminally responsible for Chapman's death. *Kakhankam*, *supra*. Watts sold the prescription drugs to Chapman and then watched him snort them, an abusive way to take the drugs. Oxycodone and a very high amount of oxymorphone, the same drug Watts sold to Miller during the controlled buy, was present in Chapman's blood. Finally, Dr. Johnson opined that Chapman's crushing and snorting the pills he got from Watts, was in part the cause of Chapman's death. Watts' conduct need not be the only factor that caused Chapman's death, contrary to Watts' argument. *Id.* Dr. Johnson further stated that not one of the contributing factors could be eliminated so that Chapman would have survived. Thus, applying the test for criminal liability under the DDRID statute, "but for" Watts' delivery of drugs, Chapman would have lived. *See id.* As the trial court noted, Watts did not present any evidence to contradict the Commonwealth's testimony. Thus, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, we conclude that the Commonwealth presented sufficient evidence to support Watts' conviction for DDRID.

In his second issue, Watts claims that the verdict for DRRID was against the weight of the evidence. Watts' Brief at 14. In support of his claim, Watts essentially reargues his sufficiency clam. *i.e.,* that the drugs Watts delivered to Chapman were not a direct and substantial cause of his death. Watts' Brief at 20.

When reviewing a challenge to the weight of the evidence, our standard of review is as follows:

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. ***Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.***
>
> * * *
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> * * *
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. ***Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.***

***Commonwealth v. Clay****,* 64 A.3d 1049, 1054–55 (Pa. 2013) (citations omitted) (emphasis added).  Absent an abuse of discretion, the trial court's decision will not be disturbed.  ***See Commonwealth v. Griffin***, 515 A.2d 865, 869 (Pa. 1986).  An abuse of discretion "is not merely an error in judgment.  Rather, it involves bias, partiality, prejudice, ill-will, manifest unreasonableness or a misapplication of the law." ***Commonwealth v. West***, 937 A.2d 516, 521 (Pa. Super. 2007) (citation omitted).  By contrast, a proper

exercise of discretion "conforms to the law and is based on the facts of record."

*Id.*

Initially, we observe that "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." ***Commonwealth v. Clay***, 64 A.3d 1049, 1055 (Pa. 2013). Here, the trial court explained its rationale for denying Watts' weight claim:

> [Watts] has never pointed to evidence that he believes was entitled to greater weight than that assigned by the jury. He simply asserts that the verdict was against the weight of the evidence based upon the same evidence outlined in SECTION III(A) above [his sufficiency challenge]. We fail to see how this is a proper claim for a new trial. [Watts] never posited specific trial evidence which was entitled to more weight than assigned by the jury.
>
> Under these circumstances, we do not believe we abused our discretion in denying [Watts'] post-sentence motion for a new trial. In light of the substantial evidence mounted against [Watts] by the Commonwealth, this Court's conscience is not shocked by the verdict of guilt.

Trial Court Opinion, 1/11/21, at 15. Given this explanation and the trial court's thorough consideration of the evidence in this case, we conclude that the trial court did not abuse its discretion in finding that the jury's verdict was not against the weight of the evidence.

Judgment of sentence affirmed.

- 10 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/5/2021