J-S06041-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MARVIN HILL | : | |
| | : | |
| Appellant | : | No. 172 WDA 2025 |
| | : | |

Appeal from the Judgment of Sentence Entered March 19, 2024
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0009072-2020

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MARVIN HILL | : | |
| | : | |
| Appellant | : | No. 173 WDA 2025 |
| | : | |

Appeal from the Judgment of Sentence Entered March 19, 2024
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0007645-2023

BEFORE:   KUNSELMAN, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED: May 26, 2026**

Appellant, Marvin Hill, appeals from the judgment of sentence entered

in the Court of Common Pleas of Allegheny County after a jury convicted him

---

[*] Former Justice specially assigned to the Superior Court.

of Voluntary Manslaughter[1] and Persons Not to Possess a Firearm.[2] Sentenced

to a term of incarceration of 19-38 years' incarceration, he raises issues

challenging both the sufficiency of the evidence and the trial court's

evidentiary rulings, and he contends the prosecution suppressed exculpatory

video recordings of the events in question. We affirm.

The trial court opinion aptly summarizes the procedural history and

pertinent facts, as follows:

> After a ten-day jury trial, the Defendant, Marvin Hill, [hereinafter, "Hill"] was found guilty of Voluntary Manslaughter [] and Violation of the Uniform Firearms Act: Person Not to Possess a Firearm[]. After the preparation of a Presentence Investigation Report, Hill was sentenced on March 19, 2024, to serve a total period of incarceration of 19-38 years.
>
> A Post-Sentence Motion and a Supplemental Post-Sentence Motion were filed. Both Motions were denied on November 19, 2024. After the reinstatement of Hill's appellate rights, a timely Notice of Appeal was filed on February 13, 2025.
>
> Factual Summary
>
> This case presents a true tragedy. On the evening of August 24, 2020, which was a hot, sunny day in the Spring Hill neighborhood of the City of Pittsburgh, three men—Hill, Devon Thompson, and Andre Crawford—decided to take the law into their own hands and wantonly, but intentionally, discharge their unlawfully possessed firearms within the [outdoor] confines of the Three Rivers Manor housing complex.
>
> Mr. Thompson, who pled guilty to Aggravated Assault, testified that he was visiting with a couple of friends. One of them yelled that "Smoke," who he knew as Hill, had a gun and was chasing

---

[1] 18 Pa.C.S.A. § 2503(a)(2).
[2] 18 Pa.C.S.A. § 6105(a)(1).

people with it. He saw Hill running toward him with a rifle and he fired his handgun toward Hill, wounding him.

Hill ducked into his apartment #132. Some minutes later, Hill emerged from his apartment, armed with a rifle. He was screaming obscenities and threatening to kill people and shoot up the parking lot. Hill fired his rifle seven times in the direction of apartment #127. This caused Andre Crawford, who pled guilty to Voluntary Manslaughter, to return fire toward Hill. One of those bullets traveled through the wall of apartment #128 2-C and hit one-year-old Zykier Young in the head, killing him. ([N.T. 10/16/23 at 194-212; N.T. 11/01/23 at 327-342]).

Via the testimony of Detective Timothy Cole, the Commonwealth presented video evidence from cameras owned and operated by the city and cameras owned and operated by the housing complex. (Exhibits 63-78). In time order on August 24, 2020, the videos show the following:

> at 4:52.17, Hill left his residence at #132 and ascended a set of outdoor stairs, [] paused at the top of the stairs, [] then ran back down the stairs, ducked his head, and went into his apartment;
>
> at 5:53.44, people in the neighborhood were reacting to something, Hill was in the doorway of #132 arguing, [he] then left his apartment #132 with a rifle in his hand, ran back up the outside stairs, then descended backwards down the stairs [and,] [a]t the bottom of the stairs, [] held the rifle in a "low ready position"; and,
>
> at 6:07.25, the door into #132 opened again and Hill returned to his apartment. (N.T. 10/16/23 to 11/01/23, Vol III, pp. 614-629).

The video evidence was corroborated by ShotSpotter [(now, Sound Thinking, Inc.)], which is a company that provides a gunfire locator service. Per the [ShotSpotter] Report, there were three different volleys of gunfire: 6:02.08 (5 gunshots); 6:07.35 (7 gunshots); and 6:07.46 (5 gunshots). According to the forensic services manager from ShotSpotter, the location of the gunshots can be skewed, but the time of the gunshots is 100% accurate. (N.T. 10/16-11/01/23, Vol. III, pp. 608-615; 703-725). A .9 mm

copper jacket fragment (Exhibit 81) and seven (7) .9 mm shell casings (Exhibits 95-107, 114-120) were found in front of Unit #132. (N.T. 10/16-11/01/23, Vol. II, pp. 271-275, 392-410).

Hill was arrested on August 26, 2020, at 10:45 p.m. on other charges. He was found hiding in a closet at 2116 Lappe Lane in the City of Pittsburgh. He was transported to headquarters. (N.T. 10/16-11/01/23, Vol III, pp. 599-603).

Detective Leonard Duncan, who was the lead detective on the shooting at Three Rivers Manor, was notified that [Hill] was in the building and had been placed in an interview room. At approximately 11:35 pm, Detective Leonard and his partner, Detective Robert Shaw, entered the interview room. Initially, they inquired about [] Hill's injury, as they were aware that he had been shot. Hill stated that he had a "through and through" gunshot wound to his right hip, and he declined medical attention. They then questioned him about the shooting incident on August 24, 2020, which was video/audio taped. (Exhibit 147). Hill acknowledged possessing a rifle, with .9 mm bullets, which he maintained was to protect himself because people were shooting at him. Hill denied firing the rifle at any point that evening. He also denied that he was the person firing a rifle on August 20 or 21, 2020. (N.T. 10/16-11/01/23, Vol III, pp. 657-665).

At Hill's request, he was interviewed again on September 2, 2020. At that time, he stated that during this incident, he was shot at 15-17 times by "Rel" (William Wolford). He continued to deny that he fired the rifle, but stated that it had .22 bullets, not .9 mm bullets. He also stated that he could obtain the rifle that he possessed that night but ultimately was unable to do so. (N.T. 10/16-11/01/23, Vol IV, pp. 773-802).

On direct examination, Hill stated that in the early evening of August 24, 2020, he was at his apartment #132 in the Three Rivers Manor housing complex. He heard gunshots, which is not uncommon in that area. He went outside and was shot in the right hip. He went back into his apartment. He did not seek medical treatment because he had violated the provisions of his house arrest, and he did not want to go back to jail.

He [testified that he] called a jitney with the idea of leaving the area. Instead, he went to a nearby laundry room and obtained a rifle. He opened the front door to his apartment and yelled to

"Rel," "Why are you shooting at me?" [Hill testified that] "Rel" responded that it was because he "shot up Unc's truck." Hill [testified that he] yelled back that he "didn't do that." He [testified that he] emerged from his apartment a second time with the rifle "in the ready position," but he did not fire it. He [testified that he] returned the rifle to the laundry room[] and [] left the area [at] about 2:50 a.m. (N.T. 10/16-11/01/23, Vol. V, pp. 1043-1112).

Trial Court Opinion, 04/22/25, at 1-4.

Hill raises the following issues for this Court's review:

I.   Was the evidence insufficient to support the conviction of Voluntary Manslaughter where the Commonwealth failed to prove specific intent, that is, that the [Appellant], Marvin Hill, specifically intended to cause the death of Andre Crawford or the victim?

II.  Was the evidence insufficient to sustain the conviction of Voluntary Manslaughter because the Commonwealth failed to prove beyond a reasonable doubt that Mr. Hill's conduct was a direct and substantial factor in causing the death of the victim?

III. Was the evidence insufficient to support the conviction of Persons Not to Possess a Firearm where Mr. Hill proved by a preponderance of the evidence each and every element of the defense of necessity.

IV.  Did the [trial] court abuse its discretion in admitting evidence pursuant to Pa.R.E. 404(b) relating to incidents that purportedly occurred on August 21 and 22, 2020, insofar as it was not relevant or material to whether Mr. Hill fired a gun on August 24, 2020, and if relevant, its probative value was outweighed by its prejudicial impact.

V.   Did the Commonwealth commit a **_Brady_** violation where the Commonwealth failed to disclose the original videotape of the scene to the defense in discovery or at any time during trial, insofar as the tape would have shown that Mr. Hill did not fire a gun, and would have established that the tape was altered to exclude exculpatory footage?

Brief of Appellant, at 5.

In Mr. Hill's first two issues, he assails his conviction for Voluntary Manslaughter of the infant boy by arguing the Commonwealth proved neither that he possessed the requisite specific intent to kill Andre Crawford or Devon Thompson nor that he was a direct and substantial factor in causing the infant's inadvertent death by gunfire.[3] We use the following standard of

---

[3] Mr. Hill also argues that jury acquittals on the charges of Aggravated Assault and Attempted Murder are incompatible with, and invalidate, his verdict of guilty for Voluntary Manslaughter, a charge that was prosecuted based on the Commonwealth's theory that he caused the infant's death beyond a reasonable doubt. He posits that if the jury found either that he did not fire his gun at Crawford or that he lacked the specific intent to kill or inflict serious bodily injury to Crawford—as he maintains must be inferred from the acquittal verdicts—then one must conclude also that he could not have caused the infant's death.

Mr. Hill is mistaken. To the extent to which his verdicts are inconsistent, we view them as simply a product of the jury's lenity and, for that reason alone, may reject Mr. Hill's argument as meritless. Our Pennsylvania Supreme Court made the following observation regarding inconsistent verdicts:

> The Supreme Court of the United States has recognized that inconsistent verdicts may be founded upon "mistake, compromise, or lenity." In order to ascertain the rationale underlying the inconsistent verdict, a court would be forced to speculate about, or probe into the jury's deliberations, an enterprise which courts generally do not, and should not, undertake.

***Commonwealth v. Muhammad***, 335 A.3d 1047, 1059 (Pa. 2025) (quoting ***United States v. Powell***, 469 U.S. 57, 65(1984)).

We turn, then, to address whether the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, proved that Hill's actions were taken with the specific intent to kill and were a direct and substantial factor in causing the death of the infant, as was required to support a verdict of guilty on the charge of Voluntary Manslaughter.

review when assessing sufficiency of the evidence challenges like those raised here.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated[,] and all evidence actually received must be considered. Finally, the [fact-finder,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Reed*, 216 A.3d 1114, 1119 (Pa. Super. 2019).

The Commonwealth may prove the intent to kill through circumstantial evidence alone. *See Commonwealth v. Johnson*, 160 A.3d 127, 136 (Pa. 2017). The specific intent to kill may be inferred from the use of a deadly weapon to inflict injury on a vital part of the body. *See Commonwealth v. Talbert*, 129 A.3d 536, 543 (Pa. Super. 2015).

Hill acknowledges that the jury received an appropriate instruction on the charge of voluntary manslaughter. He posits, however, that evidence of his specific intent to kill Crawford or Thompson was never introduced at trial. His first argument to this effect, that he "never pointed his gun in the direction

of the building in which the [one-year-old] victim was struck with a bullet[,]" Brief of Appellant at 30-31, is unavailing. Under the theories of transferred intent and foreseeability, as discussed below, Hill's specific intent to kill Crawford with gunfire during a voluntary gunfight in a densely populated housing community is transferred to the foreseeable death of the infant neighbor struck by Crawford's bullet fired in return.

Hill also argues that "no evidence was presented that [he] waved and/or raised his gun towards anyone with the intent of killing them." Brief of Appellant at 31. He maintains, instead, that he only "pointed his rifle at a building [Building 127] across the complex in order to scare off those who posed a threat to him." *Id*. He argues that his denial of firing his rifle was supported by investigators' failure to recover any .9 mm bullets or bullet fragments near Building 127 or to detect any damage to the façade of Building 127 caused by bullet strikes from where Crawford and others were shooting at him. *Id*. The jury rejected this defense.

At Hill's trial, Commonwealth witness Andre Crawford testified that he finished his 8-hour workday shift as a maintenance man and drove to Building 2129 Rhine Street, where he parked his vehicle and walked to Building 127 for the purpose of buying marijuana from someone named Marc. N.T. at 303. The video played for the jury showed Crawford arriving at Building 127, and he narrated from the witness box as his actions were depicted. *Id*. The video showed him carrying an unlicensed gun, a Smithfield .45 caliber, "for protection," he testified. He saw several longtime friends, including Devon

Thompson, N.T. at 306, before he returned to his car and relocated it to a parking space at the Building 132 and 126 area at about 5:38 p.m. N.T. at 312-313. Crawford testified that shortly afterward, Hill fired his rifle while screaming from outside his residence at Building 132 towards Building 127, and Crawford returned gunfire in what he believed was self-defense. N.T. at 315.

To support this testimony that Hill fired his rifle multiple times, the Commonwealth admitted into evidence crime scene photographs of seven spent .9 millimeter Luger RP shell casings recovered from the ground in front of Hill's Building 132, from where he allegedly fired his .9 mm rifle. (Cmwlth Ex. 95-107). N.T. 400 to 410. Testifying to the recovery of these seven shell casings was Pittsburgh Police Detective Joanna Osz, who was part of a unit that arrived at the scene shortly after the gunfire exchange. *Id*.

Commonwealth witness Devon Thompson testified that he was at the housing complex on the day in question when he overheard a "commotion," where people were screaming about Hill displaying a gun and chasing others. N.T. at 195. Thompson, who lived at the complex for over 30 years and was acquainted with Hill, said he went towards the commotion at Building 127 and saw several younger men running. N.T. at 196-97. After checking on the playground, Thompson ran near Building 126 to gain a vantage point of Building 132 and 138, where Hill was screaming and yelling "I am going to kill you mother fuckers," or words to that effect if his quotation of Hill was not precise, Thompson clarified. N.T. at 207.

Displayed for the jury during Thompson's testimony was a video recording of the events being recounted by Thompson, and he explained that the video showed Buildings 126 and 127 Rhine Place, which are on higher ground, and Building 132, where Hill resided, which is on lower ground. N.T. at 208-209. Thompson testified that when he rounded the corner near 126 and 127, he saw "[Hill] running towards [him] with a rifle, running towards 127." N.T. at 209-10. Thompson testified that his mindset at that moment was to defend himself with his firearm if Hill raised the rifle and pointed it at him. N.T. at 210. Six seconds later, the video shows Thompson firing at Hill. Thompson fired "about four or five shots." N.T. at 242. Thompson testified that he fired because Hill raised the rifle while backing up and looked like he was preparing to fire at people in front of Building 127. N.T. at 210, 239.

Thompson admitted on cross-examination that the video shows Hill descending the steps when aiming his rifle at Building 127, but he repeated that, "It is on the camera. He [Hill] lifted the gun up towards and he was displaying towards 127 and that's when I made a foolish decision [to fire at him.]" The video shows that Thompson ran away immediately afterward. N.T. at 212. Thompson admitted he did not see Hill fire the rifle at that time, N.T. at 240, but he explained his mindset was "[i]f I gave him time to fire a weapon, what could have happened?" N.T. at 240. He emphasized that he saw others running away from Hill as Hill approached them while holding a rifle and screaming threats. N.T. at 248-249, 257. "I got family and friends that live

- 10 -

in 127, so it was – my intention was to stop him from harming them."  N.T. at 251.

The jury accepted Thompson's and Crawford's account of Hill's conduct, even after learning they had entered a plea deal conditioned on their providing testimony at Hill's criminal trial that would be consistent with their post-arrest statements to police investigators.[4]  Thus, the jury received sufficient evidence to conclude that Hill unjustifiably perpetuated a gun fight by shooting at an armed Crawford with the intent to kill him, such that the transferred intent applicable to the death of the infant in this case was, appropriately, the specific intent to kill.

Next, Mr. Hill  challenges the sufficiency of evidence that he caused the infant's death, as he disputes that he was "a direct and substantial factor in causing the death" of the baby under the facts.  Because a  death can have multiple direct causes, our jurisprudence recognizes that a defendant may be deemed "a direct and substantial factor in producing the death" of a victim even if other direct causes contributed.  *Commonwealth v. Nunn*, 947 A.2d 756, 760 (Pa. Super. 2008); *Commonwealth v. Rementer*, 598 A.2d 1300, 1305–07 (Pa. Super. 1991).

---

[4] Crawford was charged with aggravated assault for shooting at Hill.  N.T. at 295.  He acknowledged that he was offered the opportunity to plead guilty to Voluntary Manslaughter and Person Not to Possess, with the Aggravated Assault charge dropped, in exchange for testifying against Marvin Hill, but with no promises on sentencing, making a 27-year aggregate sentence still a possibility. *Id*.

Hill's first causation argument states that the Commonwealth failed to establish that his actions were an antecedent, but for which the death of the victim would not have occurred. Brief of Appellant at 38. The basis of this argument is twofold.

First, he relies, again, on a meritless position that evidence was insufficient to prove he fired gunshots and engaged in the gunfight in question. Brief for Appellant at 34-35. This position is at odds with both testimonial evidence and physical evidence that he fired his rifle multiple times during a gunfight with Crawford and Thompson, who testified that Hill was a willing participant and an aggressor in the gunfight.

Second, he maintains the Commonwealth failed to establish that the victim's death was a natural or foreseeable consequence of his conduct. We disagree. Hill rejects Crawford's and Thompson's testimonies as "corrupt" and notes that "Crawford acknowledged that he had three years to get his story together." Brief of at 35. Hill contends, "Crawford fired the bullet that killed the victim[,] he was facing a general charge of Criminal Homicide and Aggravated Assault[, and] had a strong motive for fabricating his story insofar as he was offered a deal in exchange for testifying against Hill. Brief of Appellant, at 35-36.

The jury was made aware of the charging and sentencing arrangements between the Commonwealth and witnesses Crawford and Thompson, it received their testimonies, and it reviewed the security video evidence depicting the actions of those involved in the gunfight. In its deliberations,

the jury elected to credit their testimonies that Hill fired his rifle at them without necessity or justification. Additionally, Officer Osz's testimony that she collected from the grounds in front of Hill's residence seven spent .9 mm shell casings that ballistics analysis determined matched Hill's .9 mm rifle, further undermined the defense position that evidence of Hill's participation in the gunfire was lacking.

Accordingly, we discern no merit to Hill's claim that the Commonwealth failed to present sufficient evidence that he voluntarily engaged in a gun fight with two armed men and fired his rifle multiple times within a multi-family residential housing complex. Under these facts, the jury reasonably concluded that the Commonwealth proved beyond a reasonable doubt that Hill was a direct and substantial cause of one-year-old Zykier Young's death by gunfire.

In Hill's next issue, he posits that the trial court abused its discretion in admitting evidence relating to his purported illegal and destructive use of a gun on two occasions just days before the August 24th fatal shooting. Specifically, he contends that the evidence violated Rule of Evidence 404(b), prohibiting evidence of other crimes, wrongs, or acts, and that it did not qualify as an exception to the rule. Because such prior bad act evidence was neither relevant to whether he provoked the fatal shooting in question nor sufficiently probative to outweigh the prejudicial impact it had, he argues, its admission in his trial constituted reversible error.

The Commonwealth argues that evidence of the truck shooting two days earlier, wherein Hill was believed to be responsible for shooting the truck of

Crawford's uncle who was running a dice game in which Hill did poorly, was relevant and highly probative to understanding both the *res gestae* of the subject feud and Crawford's and Thompson's states of mind upon seeing Hill bearing a rifle while issuing threats of violence, as Hill had shown himself capable of engaging in destructive gunfire when angry.

We review a trial court's decision to admit certain evidence according to the following standard:

> [T]he admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion. Our standard of review of a challenge to an evidentiary ruling is therefore limited. Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

***Commonwealth v. Wilson***, 273 A.3d 13, 19 (Pa. Super. 2022) (citation omitted).

Under Rule 404(b)(1), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). The evidence may, however, "be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). "Other acts evidence is admissible under the *res gestae* exception where it formed a part of a chain, or was one of a sequence of acts, or became part of the history of the event on trial, or was part of the natural development

- 14 -

of the facts." ***Commonwealth v. Carter***, 320 A.3d 140, 149 (Pa. Super. 2024).

Thus, under Rule 404(b), evidence of prior bad acts "is not admissible for the sole purpose of demonstrating a criminal defendant's propensity to commit crimes" but "may be admissible in certain circumstances where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." ***Commonwealth v. Tyson***, 119 A.3d 353, 358 (Pa. Super. 2015) (*en banc*) (citations omitted). Evidence may be admitted under Rule 404(b)(2) only "if the probative value of the evidence outweighs its potential for unfair prejudice." ***Id.*** (quoting Pa.R.E. 404(b)(2)).

The trial court aptly summarizes the testimony at trial relevant to this issue:

> In the early morning hours of August 20th, [Appellant Hill] was involved in a dice game in the neighborhood with Jacob Hornbuckle (known as "Unc"), who is Devon Thompson's uncle. "Unc" and [Hill] got into a heated argument regarding the dice game. Mr. Thompson saw [] as he was leaving the dice game. After [Hill] left the dice game/argument, ShotSpotter reported gunshots at 4:44 a.m. When the police arrived, they recovered 13 spent .9 mm shell casings. The next night, the police investigated another report of gunfire, and they discovered a vehicle, belonging to "Unc," with three bullet holes and a flat tire. They recovered 29 spent shell casings near the scene. (N.T. 10/16-11/01/23, Vol I, pp. 97-102, 122-136, 200-201; Vol III, pp. 522-528, 529-532, 536-540) (Exhibits 33-61, 85, 86, 87, 114-120).
>
> First, there was no testimony directly linking [Hill] to the shootings that occurred on the 20th and 21st; however, the circumstantial evidence demonstrated that the 9 shell casings recovered on the 20th and 12 of the shell casings recovered on the 21st matched the .9 mm shell casings recovered on the night of the homicide in the

- 15 -

location where [Hill] was shooting his rifle. (N.T. 10/16-11/01/23, Vol III, pp. 522-528, 529-532, 536-540) (Exhibits 33-61, 85, 86, 87, 114-120).

Second Mr. Thompson testified that he believed that it was [Hill] who "shot up" his uncle's truck. The [trial court] interrupted Mr. Thompson's testimony to give the jury this cautionary instruction:

> This testimony that Mr. Thompson believed that Mr. Hill shot his uncle's truck, you are not to consider that for whether it is true that Mr. Hill shot Mr. Thompson's uncle's truck. It is being admitted into evidence for you to consider the effect that it had on Mr. Thompson's state of mind. So, it is not evidence that Mr. Hill actually shot the truck. It is only evidence of Mr. Thompson's state of mind. (N.T. 10/16-11/01/23, Vol I, p. 217).

In order for the jury to understand why Mr. Thompson fired his handgun at [Hill] on the 24th, they had to hear his testimony about wanting to avenge the damage to his uncle's truck, which he believed was caused by [Hill] two days prior to the night of the homicide.

Trial Court Opinion at 7-8.

The admission of evidence of episodes of gunfire on the 20th and 21st for the limited purpose of understanding Mr. Thompson's state of mind on the 24th when he encountered an armed Mr. Hill between Buildings 132 and 127 was appropriate. The jury instruction accompanying the admission of such evidence clearly explained its limited purpose and thus enabled the jury to view such evidence only as part of the recent history between the men leading up to the gunfight in question. As such, we agree that the Commonwealth's evidence was properly admitted under a *res gestae* exception to Rule 404(b).

In Mr. Hill's next issue, he asserts that trial evidence established his affirmative defense of necessity with respect to the charge of his unlawfully

possessing a firearm under 18 Pa.C.S.A. § 6105, Persons Not to Possess a Firearm.  On this point, he disputes neither that he possessed a firearm on the 24th nor that he was legally prohibited from possessing a firearm.  *See* *Brief of Appellant*, at 51.  He argues, instead, that he believed resorting to his rifle was necessary and justifiable given the threat of serious harm posed by Crawford and Thompson, who attacked him with gunfire that included one bullet grazing his hip and causing a minor wound while he had been standing outside of his home.  *Id*; N.T. at 801.  Such evidence, he maintains, supported his actions of retrieving his rifle and returning outside in what he describes as an act of self-defense and, thus, negated the intent element necessary to convict him of unlawful possession.

The Commonwealth agrees that Hill was under fire by Crawford and Thompson, but it argues that Hill unnecessarily forwent the opportunity to adopt a self-defense posture by taking shelter inside his residence with the rifle and placing a 9-1-1 emergency phone call for police intervention. Instead, he chose to emerge from his residence with a loaded rifle and take matters into his own hands by engaging the two armed men in a gun fight in a closely quartered residential neighborhood.

The defense of justification can apply to a Section 6105 charge where the defendant's possession of a firearm occurred during an act of self-defense. *See*, *e.g.*, *Commonwealth v. Miklos*, 159 A.3d 962, 968-69 (Pa. Super. 2017).  However, the defendant must offer evidence to show (1) that he was faced with a clear and imminent harm, not one which is debatable or

speculative; (2) that he could reasonably expect that his actions would be effective in avoiding this greater harm; (3) that there is no legal alternative which will be effective in abating the harm; and (4) that the Legislature has not acted to preclude the defense by a clear and deliberate choice regarding the values at issue. *Commonwealth v. Billings*, 793 A.2d. 914, 916 (Pa. Super. 2002); *Commonwealth v. Wright*, (non-precedential decision) No. 2841 EDA 2024, 2026 WL 687565, at *5–6 (Pa. Super. filed Mar. 11, 2026).[5]

In the case *sub judice*, the trial court opines that Mr. Hill failed to show there was no legal alternative which would have been effective in abating the harm:

> Although [Hill] has arguably proven the first element as the evidence demonstrated that Devon Thompson was shooting at him, he has failed to prove that he did not have other legal alternatives such as, calling the police, having someone else call the police, staying inside his residence, or leaving the area. These were all viable options. Instead, [Hill] made a conscious choice to go to a nearby laundry room, retrieve a high-caliber rifle, exit the building, and randomly shoot several times toward a neighboring building, even though he knew that the building was occupied, and he could injure an innocent bystander.

Trial Court Opinion, at pp. 6-7. We agree that the facts adduced at trial failed to support the defense position that he could not have abated the harm either by adopting one of the legal alternatives identified by the trial court or by taking the rifle from the building's laundry room and arming himself in a self-

---

[5] Pursuant to the Pennsylvania Rules of Appellate Procedure, we may cite nonprecedential memorandum decisions of this Court that were filed after May 1, 2019, for their "persuasive value." Pa.R.A.P. 126(b)(1)-(2).

defense posture inside his apartment while placing an emergency phone call requesting a police presence.  Therefore, this issue affords him no relief.

In Mr. Hill's final issue, he argues that the Commonwealth committed a **Brady**[6] violation when it did not provide the defense with what he contends was an exculpatory original video recording from the camera covering the front of Building 132.  In **Brady**, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused...violates due process where the evidence is material either to guilt or to punishment...." **Id.**, 373 U.S. at 87.  To prove a **Brady** violation, a criminal defendant must demonstrate the following:

> (1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant, and (3) the suppression prejudiced the defendant. Prejudice is demonstrated where the evidence suppressed is material to guilt or innocence.

**Commonwealth v. Koehler**, 36 A.3d at 133 (Pa. 2012) (citation omitted).

> Importantly,

> favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

**Id**. (citation omitted).

---

[6] **Brady v. Maryland**, 373 U.S. 83, 83 S.Ct. 1194 (1963).

According to Hill, he relies on "common sense" to conclude the Commonwealth unlawfully modified and therefore suppressed the original security video recording because it "would have: 1) impeached Crawford's incriminating testimony that he saw Mr. Hill fire a gun at 127; 2) shown that Mr. Hill did not exit Building 132 at 6:07:35, was not holding a gun at or after that time, and did not fire a gun at or after that time on August 24, 2020; and, 3) revealed that the shell casings found near building 132 were there prior to the [sic] when the shooting started on August 24, 2020."  Brief of Appellant at 55.

Specifically, Mr. Hill speculates that "the original videotape was altered, and the doctored copy was provided to him and presented to the jury."  Brief of Appellant at 56.  Segments were added, he claims, to show someone standing in the doorway of [Building] 132 at a particular time stamp to suggest Mr. Hill occupied the spot from where gunfire emanated, and at other moments, he continues, the recording was redacted to remove portions that would have clearly shown he was not firing a gun in front of 132 at the relevant time "as the Commonwealth alleged."  *Id*. at 56.  He concludes, "There is a reasonable probability that if the original footage had been disclosed, the result of trial would have been different."  *Id*. at 57.

The Commonwealth responds that this issue is wholly frivolous and unsupported by the record, as the Commonwealth never possessed or deleted the surveillance video recording that Hill believes existed.  It refers this Court to the testimony of Detective Cole of the Pittsburgh Police Department, who

explained that he retrieved and downloaded all relevant crime scene video recorded by the camera system operating at Three Rivers Manor and furnished it to the department detectives and the District Attorney's Office.  N.T., Vol I, at pp. 157-58, 160.  Any gaps in the recordings, in Detective Cole's opinion, were attributable to the poor quality of the recording system.  N.T. at 165.

On this issue, the trial court observes,

> [Mr. Hill] bases this tampering claim on his belief that "logic and reason" do not support the fact that the video evidence, which is extensive, fails to show him firing the rifle.  While it would have been very helpful to the Commonwealth if there was a video showing [Hill] either firing or not firing his rifle, the fact that such a video does not exist does not lead to the conclusion that the Commonwealth altered the video evidence.  Such a conclusion is quite a stretch.  Rather, the testimony from Sergeant Timothy Cole, of the Computer Crime Unit, that the video cameras installed by the city are "poorly made" and they often have "blips" and blackouts caused by birds, wind, leaves, etc. is a much more likely explanation for the missing video segment.  Sergeant Cole further explained the "skips" in the videos, when he testified "it could be a multitude of different reasons;  it could be power fluctuations, it could be overloading the system . . . it could be a wi-fi drop." (N.T. 10/16-11/01/23 , Vol II, pp. 160-64, 180, 645-646).

TCO at 9.

Mr. Hill's argument consists of unsubstantiated claims that the original video would have depicted his justifiable conduct, but the deliberate and illegal redactions and alterations performed by the Commonwealth to inculpate him resulted in the adulterated video shown to the jury.  He has not, however, proven the suppression and alteration of such evidence as he must do to prevail on his *Brady* claim.  Though he communicated these claims through questions asked during examinations and cross-examination of witnesses, the

jury accepted the testimony of Commonwealth witnesses who accused Hill of firing his rifle at Crawford and Thompson during the exchange of gunfire that resulted in the death of one-year-old Zykier Young. As such, this claim fails.

Judgment of sentence is Affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

5/26/2026